17066

NOAH FRAZIER, Respondent-Appellant, v. MARY HERRING FRAZIER, Appellant-Respondent

(89 S. E. (2d) 225)

150

*James F. Covington, Jr., Esq.,* of Bennettsville, *for Appellant, Noah Frazier,*

*Messrs. Goldberg & Cottingham,* of Bennettsville, *for Respondent, Mary Herring Frazier,*

*Messrs. Goldberg & Cottingham,* of Bennettsville, *for Mary Herring Frazier, Appellant,*       .

*James S. Covington, Jr., Esq.,* of Bennettsville, *for Respondent, Noah Frazier,*

154

September 15, 1955.

Baker, Chief Justice.

There are two distinct and separate appeals in this case, which may be denominated as the main appeal and the subsidiary appeal. These appeals have been so dealt with by counsel, separate briefs having been filed; and while the main appeal was orally argued in addition to the printed briefs filed, the subsidiary appeal was submitted on the printed briefs. We will so deal with them herein.

In that in the main appeal the defendant is the appellant, and in the subsidiary or secondary appeal the plaintiff is the appellant, we will hereinafter refer to the parties to this action as plaintiff and defendant.

The main appeal is from an order issued out of the County Court of Marlboro County granting to plaintiff a divorce *a vinculo matrimonii* from the defendant.

Other than the issue raised as to the admission of the testimony of the witness Prentiss. A. Frazier, all exceptions are directed to the findings of fact by the trial Judge that defendant had deserted plaintiff; that the desertion had continued for a period of one year prior to the commencement of the action, and that a reconciliation between them could not be effected.

It is the contention of plaintiff that he and the defendant last lived together as husband and wife in January, 1953, at Denthill Farms, Va., where he had provided a home for her, and then for only two days, when she deserted him and returned to the home of her mother in Bennettsville, S. C. On the other hand, it is the contention of defendant that she and plaintiff thereafter lived together as wife and husband at the home of her mother, in March, 1953, and in the latter part of September, or the first part of October, 1953, the latter date being the only one pleaded in her answer, and

that it has never been her intention to desert him. The significance of the date of the commencement of this action, March 3, 1954, in the light of the governing statute, Section 20-101(2), Code, 1952, is therefore quite obvious.

The plaintiff and defendant were married May 19, 1945. Very little of the intervening time between that date and January, 1953, have this couple lived together as husband and wife under the same roof, including weekend visits and other visits of plaintiff to defendant at her mother's home in Bennettsville, S. C., to where she invariably returned after living with him for very short periods of time at places where he was stationed and had provided a home for her. The longest period of time they ever lived together continuously in a home provided by plaintiff was in or near Charleston, S. C., during the first year of their marriage, if that was when he was employed at the Navy Yard there located. At all other times the defendant has lived with her mother at the latter's home, Bennettsville, S. C., some of which time, for instance, about two years between 1948 and 1953 while the plaintiff was overseas in the Philippine Islands, was with his permission. We gather from the record before us that the plaintiff has been in the U..S. Army from 1948 until the present time, and that the defendant has drawn an allotment the entire time ranging from $50.00 per month in the beginning to $137.00 per month after a child was born of this union and plaintiff had been promoted to sergeant. Pending this appeal, defendant is still drawing $87.00 per month in addition to the $50.00 per month which it was decreed should be paid by plaintiff for the support of their child. It should be stated here that plaintiff has never contested the payment for the support of his child, but to the contrary has always recognized his obligation thereabout. It is in dispute whether at other times when plaintiff was not overseas, he arranged for a home where defendant could have lived with him, and she refused to do so, and when she did, after remaining with him for a few days, she would leave and return to the home of her mother. Follow-

ing each such occasion there was a reconciliation until defendant returned to the home of her mother in January, 1953, after staying with plaintiff for two days at Denthill Farms, Virginia, where he was stationed, and had provided a home for her; and there she has continuously remained and resided.

If the foregoing limited sketch of the testimony leading up to the alleged desertion of plaintiff by the defendant in January, 1953, contains any misleading or incorrect statement of fact, it is due to the manner and indefiniteness of the testimony as presented or adduced upon the trial of the case in the court below before the County Judge. Mainly for the purpose of furnishing some idea of the situation when the desertion is alleged to have occurred in January, 1953, have we sketched the testimony as to this couple's married life prior to the last mentioned date.

As hereinbefore indicated, the real issue now before this Court is whether the testimony was sufficient to support the holding of the trial Judge that the defendant deserted the plaintiff at Denthill Farms, Virginia, in January, 1953, with the intent then or thereafter formulated in her mind to desert him, and that there has been no cohabitation between them as husband and wife since said last mentioned date.

Plaintiff testified that being stationed at Denthill Farms Station, Virginia (Warrenton, Virginia), he acquired living quarters for defendant and their child, and she joined him there in January, 1953, for two days, and then returned to her mother's home; that she gave no reason why she was leaving—"she just went downstairs in the living room and started crying and she continued to cry and announced that she was catching the next bus back to Bennettsville"; that "rather than see her get out in the snow and ride the bus home—I tried to talk her into not leaving—to stay until it slacked up—when she absolutely refused, I went to the post, obtained a leave and took her in the car and drove her back down here"; that he had to return immediately as his leave

was up; that the next time he returned to Bennettsville was in March, 1953, when he was on his way to California; that he was there for approximately a week, did not stay with defendant—not even for a night, because she refused to let him, but stayed at his mother's home; that while he had a thirteen days' leave, he took only seven or eight; that it was in October, 1953, that he next was in Bennettsville when he returned from California, and at that time he remained in Bennettsville approximately twenty-five days, and stayed at his mother's home.

We now quote from plaintiff's testimony on cross-examination by defendant's attorney:

"Q. At no time you stayed at your mother-in-law's house? A. The first night after I returned from California I slept in my car in my mother-in-law's yard.

Q. Where did you sleep the second night, Sergeant? A. At my mother's.

Q. At no time during that leave did you stay at your mother-in-law's with your wife in October 1953? A. No.

Q. You stayed a week, your testimony is that you didn't stay with her at all, is that the truth? A. No, I did not, because the first night I returned home at approximately ten o'clock I went in to see her and the child with intention of staying there. I felt faint because I had been driving so long without any sleep so I went outside to get fresh air and I walked up in front of the mill, and I talked to my mother in front of her house, and when I returned to my mother-in-law's the doors were locked. I knocked, they didn't let me in, so I crawled in my car and I slept in the front seat of my car.

Q. You testified you went there with the intentions of staying with her that night? A. Yes, I went there with the intention of staying.

Q. Then if she deserted you and you desired to stay with her in October, 1953, that wasn't desertion, you attempted reconciliation, is that correct? A. Yes, I attempted it.

Q. And are you still willing to do so? A. No, I wouldn't, I think she has had ample opportunity to decide whether she wants to live with me or not before.

Q. Sergeant, your testimony as I understand it, I want to get the record straight, you did not stay with your wife during October, 1953, at her house. A. No, I did not.

Q. You did not live or cohabit with her during that time, is that your testimony? A. That's correct."

The plaintiff further testified that after January, 1953, and when he had been transferred to California, he there acquired an apartment and unsuccessfully undertook to have defendant join him, suggesting that she come either by plane or train, and he would provide for her transportation.

Prior to reporting herein any of the testimony in behalf of defendant, it becomes necessary that we pass upon the issue raised by defendant's stated Question 3: "Did trial Judge err in admitting the testimony of Prentiss A. Frazier over objection of defendant's counsel?" Defendant's exception 6 alleges that the testimony of this witness was hearsay and therefore inadmissible, and was over her objection. The only objection to the testimony of this witness, if such could be considered an objection, was made near the beginning thereof when he was asked by plaintiff's counsel what his brother, the plaintiff herein, told him was his reason for being in Bennettsville in January, 1953. This was made wholly immaterial when defendant also testified that plaintiff was there to get her and their child to go with him to live at Denthill Farms, Virginia, and that she went there with him. Further, at the time this question was "objected" to, it was not answered, and there is no other objection to his testimony recorded. Another portion of his testimony that could have been objected to as being hearsay was as to where plaintiff slept the first night he was in Bennettsville in October, 1953, upon his return from California. The witness testified, without objection, that plaintiff slept in his car, and, upon further questioning, this witness stated that he knew that plaintiff slept in his

car because it was general knowledge throughout the mill village that this was where he slept, and that there was considerable kidding of plaintiff about it. And there is one other portion of his testimony bottomed upon "hearsay," to wit, that plaintiff provided defendant with a home, but she wouldn't live with him. There was no objection made as to this testimony.

The witness (Prentiss A. Frazier) testified of his own knowledge that with the exception of the first night the plaintiff was in Bennettsville in October, 1953, he slept in the same room with him at their mother's home the entire period of time the plaintiff remained in Bennettsville, which plaintiff had testified was about twenty-five days; and that plaintiff and defendant had not lived constantly together at any time from the date of their marriage.

Defendant testified that in January, 1953, plaintiff came for her and their child; that she packed her clothes and the child's clothes and started with him in a car for Virginia; that the road by the home of her mother had been worked and the car got in a bog and too hot, and the child vomited "all over the car"; that they carried the child back to her mother's and there left her and her clothes, and continued the trip to Virginia; that she called the second day after reaching their destination and inquired of a neighbor of her mother's as to the condition of the child, and upon being informed there was no improvement, it was decided between them (plaintiff and defendant) for her to come back "home," and he brought her, spent the night with her, and returned to Virginia; that the next occasion on which she and plaintiff lived together was a short while prior to Easter when he was being transferred to California, and had a 30 days' leave, 25 days of which was spent with defendant in her mother's home; that she next lived with plaintiff at her mother's home when he returned from California, from *Monday, September 27th,* (1953) through the following Friday; that it was during this week that her witnesses, Mrs. Hamilton and Mrs. Craft, came by her mother's home,

and saw her and plaintiff in bed together; that it was *not* in March, 1953, or the spring of 1953 "around Easter" when plaintiff was on his way to California that she accompanied him on a trip to Philadelphia, as her mother had testified, but it was in the spring of 1952 that they made this trip, soon after plaintiff had returned from overseas, and that he returned from overseas in March, 1952.

At some time in 1953, defendant purchased a lot near her mother's home in Bennettsville for $200.00 with $100.00 she had saved from her allotment, and $100.00 she borrowed from her mother, and had the deed made in the joint names of herself and plaintiff. She testified that this lot was purchased with the intention on her part that they would build a home thereon. The record does not disclose that plaintiff was ever consulted thereabout or knew of such purchase until after this action was commenced.

Mrs. Annie Herring, the mother of defendant, and a witness for her, testified that after January, 1953, and before Easter, and "when he (plaintiff) was on his way to California, he spent thirty days at "her house, and stayed with Margaret"; (apparently the "Margaret" referred to is the defendant); that the next occasion on which she saw plaintiff was in September, *the 27th, Monday night,* when he returned from California, and she opened the door for him; that he came in and went to bed on that *Monday night of September 27th,* and stayed in her home from that night to the following Friday; that she saw plaintiff and defendant in bed together, fixed meals for them, and ate with them, and this was in October, 1953; that her daughter had always paid board, $25.00 per month when she was receiving an allotment of $50.00 per month, and more when the allotment was increased, and at the time of the hearing and when she was testifying, about $50.00 or $60.00 a month for herself and child. We quote from the record:

"Q. Does she give it to you all at one time out of one check? A. That's right.

Q. Or does she give you some at different times? A. Well, during times.

Q. Just whatever she feels like? A. Uh, huh.

Q. And you say your son-in-law, Noah Frazier, spent thirty days with you around Easter, 1953. A. That's right, him and his wife even taken a trip to Philadelphia and back just before leaving—

Q. Last year? A. Yes, he was on his way to California.

Q. They went to Philadelphia? A. Yes and come back on Friday before Easter.

Q. And on Monday night, October 27, 1953, you state the first night he was home that you saw them in the bed, that you saw them going in— A. Got up and open the door for him and he closed the door between mine and my husband's room and his and Margaret's room, then he went in and went to bed."

We again quote from the testimony of this witness:

"Q. Mrs. Herring, was it not in 1952 that your daughter and her husband went to Philadelphia? A. It was the year just before he went to California.

Q. The year before he went to California? A. I mean the time before he went to California, he was home on his leave right then to go to California.

Q. And he was on thirty days' leave? A. I reckon he was on thirty days' leave.

Q. You testified he was on thirty days' leave. A. Well, he said he was on thirty days' leave and he come there home, stayed a while, *and him and Margaret caught a bus and went to California and drove a car back.*" (Emphasis added.)

Mrs. Ethel Hamilton, an aunt of the defendant, testifying in her behalf, stated: that she saw the plaintiff at the home of her sister, the mother of defendant, during October, 1953; that he was in defendant's bedroom at this home, and in bed with the defendant; that the door to this bedroom was open, and she stood in the doorway and talked to them; that this was between seven and seven-thirty in the morn-

ing and she had gone there to inquire concerning her sick brother-in-law, and that she generally went down there two or three times a day. We quote from the record, *direct examination by counsel for defendant:* "Q. Your testimony is on this morning, *October 13,* you were at their house and saw them in bed together, is that correct? A. Yes, sir." (Emphasis added.)

Mrs. Pearl Craft, another witness on behalf of the defendant testified: that she was a neighbor, and had occasion to go to the home of Mary Herring Frazier (the defendant) one morning early in October, 1953, and there saw·the plaintiff and the defendant in bed together.

"Agreement as to unrecorded testimony in the Frazier hearing.

"It is agreed by and between James F. Covington, Jr., and Edward B. Cottingham, the attorneys for plaintiff and defendant respectively that Noah Frazier in reply testified that in the Spring of 1953 he had (14) fourteen or (15) fifteen days leave and that he used part of it to travel to California; that he did not stay with his wife or co-habit with her."

\* \* \*

"That he further testified that in September or October of 1953 he did not live or co-habit with his wife.

"The Court asked Mr. Frazier if he could be reconciled with his wife and he stated that he could not or he would not have brought this action before the Court.

"The Court asked Mrs. Frazier if she could be reconciled with her husband and she stated, yes, as long as he would provide a place for her to live with him."

The foregoing briefly covers the material and relevant testimony in the case.

The "Questions Involved" as stated by the defendant (appellant here), omitting No. 3 which has hereinbefore been quoted and passed upon, are:

"1. Was the evidence sufficient to warrant the trial judge's finding of desertion?

"2. Did the trial judge err in holding that the desertion, if any, continued for a period of more than one year?

"4. Was there sufficient corroboration of the testimony of the plaintiff?

"5. Did the trial judge err in finding that a reconciliation between the parties could not be effected?"

Fortunately, neither the custody of the child born to the parties to this action, nor the amount decreed by the court below to be paid by the plaintiff for her support, is involved in this appeal.

We quote from *Mincey v. Mincey,* 224 S. C. 520, 526, 80 S. E. (2d) 123, 126:

"An action for divorce is within the equity jurisdiction of the Court. Accordingly the evidence must be considered in the light of the well settled rule that in an equity case findings of fact by a Master or Referee, concurred in by a Circuit Judge, will not be disturbed by this Court unless it appears that such findings are without evidentiary support or are against the clear preponderance of the evidence."

As is well stated in plaintiff's printed argument, certainly where the findings of fact were by the trial Judge himself, who had an opportunity of not only considering the testimony but also of viewing the parties and the witnesses and considering their attitudes in adjudging the veracity of their testimony, as in this case, makes for a still stronger application of the rule that his findings will not be disturbed unless it appears that such findings are without evidentiary support or are against the clear preponderance of the evidence.

It is the established law in this state that in an equity case, this Court may reverse the findings of fact of a Circuit Judge, or a Judge of a County Court, when the appellant satisfies this Court that the preponderance of the evidence is against the finding of the lower court.

*Forester v. Foreser,* 226 S. C. 311, 85 S. E. (2d) 187, and supporting authority therein cited.

In *Machado v. Machado,* 220 S. C. 90, 100, 66 S. E. (2d) 629, 633, the essentials of desertion are stated to be: " '(1) cessation from cohabitation, (2) intent on the part of the absenting party not to resume it, (3) absence of the opposite party's consent, and (4) absence of justification.' " It is further stated: "All the authorities agree that an intent to desert is an indispensable element."

In 17 Am. Jur., Divorce and Separation, Section 379, is the following:

"In proceedings for divorce on the ground of desertion, no general rule can be formulated as to what evidence is or is not admissible, each case depending upon its own particular circumstances. Since the intent to abandon is largely a matter of inference and presumption, the subsequent conduct of the parties frequently makes plain the intent with which a previous act was performed, and evidence of such conduct is admissible to ascertain the intent."

The law prevailing in this state governing corroboration of testimony in divorce actions is succinctly set out in *Brown v. Brown,* 215 S. C. 502, 512, 56 S. E. (2d) 330, 335, 15 A. L. R. (2d) 163, and we quote therefrom:

"The general rule is that in the absence of a statutory provision governing the question, a divorce will not be granted on the uncorroborated testimony of a party or the parties to the suit. This is the view maintained by the decided weight of authority. See the many cases cited in Annotation, Ann. Cas. 1913B, page 3. The rule applies whether the charge is adultery or the various other statutory grounds for divorce. Since the main reason for the rule is to prevent collusion between the parties, the rule is not generally deemed inflexible; and may be relaxed when it is evident that collusion does not exist. 27 C. J. S., Divorce, § 136 a, page 730."

"As to the sufficiency of corroboration, it is well
■   stated in 27 C. J. S., Divorce, § 136 b, page 732:

"There is no definite rule as to the degree of corroboration required, but each case must be decided according to its own facts and circumstances. The corroborating evidence must go to all the material allegations of the complaint necessary to sustain a decree of divorce but it need not in itself be sufficient to warrant that relief. Thus it is settled that complainant's testimony is not required to be corroborated in every particular, but that it is enough if corroborated by the testimony of third persons as to some of the causes alleged, * * *. So it may be sufficiently corroborated by circumstantial evidence. * * *' "

The issues of fact are: (1) Whether it was by mutual agreement that defendant remained with plaintiff for only two days in Virginia in January, 1953; (2) whether they ever thereafter lived together as husband and wife; (3) whether the defendant formed the intent to desert plaintiff at the time she returned to her mother's home from Virginia in January, 1953, or thereafter formed such intent; and (4) whether there is sufficient corroboration of plaintiff's testimony.

While the answer of defendant alleges that she and plaintiff "last resided as man and wife during October, 1953," she also testified that they lived together as husband and wife for about twenty-five days prior to Easter, 1953, at the home of her mother when he was on his way to California. We assume, from the testimony of defendant's mother, that she was placing the time as in March, 1953. If so, then this cohabitation would also have been within one year from the commencement of this action. However, it appears that defendant and her counsel relied chiefly on the alleged co-habitation in October, 1953, pleaded as a defense under the statute, to defeat this action. We will therefore make only passing reference to any claimed cohabitation in March, in discussing the testimony of defendant's mother, if indeed we enter into any discussion thereof.

It is not contended by defendant that the findings of the trial Judge are without evidentiary support, but that they are against the clear preponderance of the evidence. A "preponderance of the evidence" stated in simple language, is that evidence which convinces as to its truth. We are unable to agree with the contention of defendant.

Prior to January, 1953, it is not in dispute that plaintiff and defendant had lived together under the same roof as husband and wife comparatively very little, but plaintiff being then stationed at Denthill Farms, Virginia, and having there procured living quarters for defendant and their child, had persuaded her to join him. He drove his automobile to Bennettsville, where his wife and child were residing with her mother, for the purpose of transporting them to Virginia. Upon his reaching Bennettsville, defendant packed her clothes and the clothes of their child, and they all started for Virginia, but a road leading from defendant's mother's home, and which it was necessary they travel, had recently been worked, and the plaintiff's car became mired in a bog. In getting the car out, it ran very hot and caused, according to the testimony of defendant, the child to become nauseated. Whereupon, they returned to their starting point, and left the child, and its clothes, with defendant's mother, and proceeded on the trip. Just what connection the car running hot in January had with the child sitting in the car becoming nauseated is unexplained, and is more than passing strange.

It is not disputed that defendant remained in Virginia with plaintiff for only two days. She claims that plaintiff was agreeable to her returning to her mother's home to take care of their child, but plaintiff denies this, and gives an entirely different version not necessary to here repeat. It is noticed that, if defendant phoned in the meanwhile to inquire as to the condition of their child, she neither phoned to the doctor who ordinarily treated this child, nor to her mother, but to an unnamed neighbor. She so testified. We

find no denial by defendant of plaintiff's testimony that while he was in California he there acquired an apartment and undertook to have defendant join him there, but she refused. This was between March, 1953, and October, 1953. But defendant argues that the purchase by her of a lot in Bennettsville near the home of her mother (plaintiff's counsel states in his printed argument that this lot is located "next door" to the mother of defendant), and having the deed therefor made in their joint names, which transaction took place during 1953, and prior to October of that year, is evidence that she had no intention of deserting the plaintiff in January, 1953. Such action on the part of defendant amounts to no more than a self-serving declaration, unless it could be said that it is evidence that if plaintiff would build a home on, and live at a location selected and approved by her, she would not desert him. Especially is this true when consideration is given to the fact that plaintiff was not consulted as to the purchase of this lot.

The defendant undertook to bolster her testimony as to cohabitation with plaintiff in March, 1953, by the testimony of her mother; and as to cohabitation with him in the latter part of September and the very first part of October, 1953, by testimony of an aunt, a neighbor of her mother's and her mother. There are so many self-contradictions in the testimony of defendant's mother, and direct contradictions by defendant herself, that we merely draw a veil of sympathy. thereover. The aunt's testimony at least indicates that she was devoted to her brother-in-law, the father of defendant, and that she had faulty eyesight. She testified that she saw plaintiff and defendant in bed together at the home of defendant's mother on the morning of October 13, 1953. She thus contradicts not only the testimony of the defendant, but also that of defendant's mother, both of whom testified that plaintiff came there upon his return from California, on the night of Monday, September 27th, 1953, and there remained until the following Friday. (Incidentally, the last Monday in September, 1953, was the 28th day thereof.) The neigh-

bor remembered at the time of the hearing before Judge Evans on June 19, 1954, that the first part of October, 1953, she went to the home of defendant's mother to borrow some eggs, and saw plaintiff and defendant in bed together when she went to defendant's room to get a pattern. There was nothing to fix this date in her mind.

It will serve no useful purpose to make further reference to the testimony. We are far from convinced that the preponderance of the evidence is against the findings of the trial Judge. And to the contrary, after a thorough study of the entire record, we are of the opinion that there was ample testimony and circumstances to support all of his findings of fact, which include specifically that it was not by mutual agreement that defendant returned to her mother's home in January, 1953, from Virginia; that the parties to this action did not thereafter live together as husband and wife; that at the time or thereafter, when defendant left the home of plaintiff provided for her in Virginia, it was her intention then or thereafter formed to abandon and desert him; and that there is sufficient corroboration of plaintiff's testimony.

We now consider defendant's No. 5, of the "Questions Involved," which relates to a reconciliation between the parties. The final decree of the trial Judge, which will be reported herewith, contains the following: "Finding that a reconciliation between the parties could not be effected, I have considered the testimony carefully." This is in substantial compliance with Section 20-110 of the Code of 1952, on this subject, the case not having been referred and the testimony having been taken before the County Judge as the trial Court.

We can see no reason for disturbing this finding, especially in the light of the record which contains the information that this was the second time that plaintiff had commenced an action for divorce from the defendant, and the first action withdrawn when there was a reconciliation.

The decree of divorce *a vinculo matrimonii* is affirmed.

The subsidiary appeal is from the order of Judge Evans of date, October 9th, 1954. The "Statement" contained in the printed brief of appellant, and adopted by the defendant in her printed brief, is as follows:

"Noah Frazier, hereinafter referred to as the husband, instituted action for divorce on the grounds of desertion against Mary Herring Frazier, hereinafter referred to as the wife. By timely motion, counsel for the wife moved for an Order to have the husband pay a reasonable attorney's fee to her counsel for the defense of the action. This motion was supported by Affidavit of the wife to the effect that although she received an allotment from her husband (a soldier in the U. S. Army) of $137.10 monthly that she was without adequate funds, or source with which to pay counsel for her representation. By Order dated August 10th, 1954, the husband was ordered to pay 'the sum of One Hundred Twenty-five and no/100 ($125.00) Dollars for attorney's fee for the defense of this action, and the cost of this action.' The husband paid this sum to the firm of Goldberg and Cottingham, Attorneys for the wife, on June 10th, 1954, and received from them a receipt which showed "balance due: none except court cost.' The matter was heard by the Presiding Judge and on August 31st, 1954 a final decree was issued awarding a divorce to the husband on the grounds of desertion by the wife; the wife was awarded custody of the minor child and the husband ordered to pay monthly the sum of Fifty ($50.00) Dollars for maintenance and support of said minor; no alimony or support was awarded to the wife. Timely Notice of Intention to Appeal was filed by the wife's counsel, and thereafter on October 4th, 1954 the wife's attorneys moved for 'such reasonable attorney's fee as may be set by the Court and such cost as may be required for an appeal of this action.' By Order dated October 9th, 1954, over the objection of his counsel, the husband was ordered to pay an additional fee of One Hundred Twenty-five ($125.00) Dollars

for the wife's Attorney and the further sum of Fifty ($50-.00) Dollars to defray the cost of printing the appellant record."

The parties to this action are now in reverse positions from the main appeal. We will continue to refer to them as plaintiff and defendant.

The issue in this appeal is whether the trial Judge erred, in the light of his order of August 31st, 1953, granting the plaintiff a divorce *a vinculo matrimonii* from defendant, in ordering plaintiff to pay "unto the defendant the sum of One hundred twenty-five ($125:00) Dollars which shall be used by the defendant to pay an additional attorney's fee, and the further sum of Fifty ($50.00) Dollars be paid unto the defendant for costs involved in printing of transcript and briefs."

The additional counsel fee ordered to be paid by plaintiff for defendant's counsel was for services to be rendered by them in prosecuting her appeal from the order dated August 31, 1953 granting the divorce.

While the fact that defendant was unsuccessful in the defense of the divorce action may not necessarily deprive her of the right to require plaintiff to pay the costs of prosecuting the appeal to this Court, 17 Am. Jur., Divorce and Separation, Section 580; Annotation 18 A. L. R., page 1494; *Graves v. Graves,* 193 Va. 659, 70 S. E. (2d) 339, there are no equities or circumstances here justifying such an allowance. It is uncontradicted that the appeal of defendant enables her to continue to draw from the U. S. Government and this plaintiff jointly, an allotment of $137.00 monthly for the support of herself and their minor child, which exceeds by $87.00 each month the required support for the minor child; and this allotment will continue until this appeal is decided. The right of an appeal was never intended to be exercised solely and wholly as a device whereby a litigant could be advantaged at the expense of the opposing litigant.

The costs of this appeal will be taxed in accord with the established rules and law governing same.

The exceptions of plaintiff are sustained.

It is the judgment of this Court that the order granting plaintiff a divorce *a vinculo matrimonii* from the defendant be affirmed; and that the order requiring the plaintiff to pay additional fees for defendant's attorneys, and $50.00 for printing the record be reversed.

Affirmed in part. Reversed in part.

STUKES, TAYLOR, OXNER and LEGGE, JJ., concur.